## Case No. 15,360.

### UNITED STATES v. HEWSON.

[Brunner, Col. Cas. 532; 1 7 Law. Rep. 361.]

Circuit Court, D. Massachusetts. Nov., 1844.

MURDER—CHALLENGES OF JURORS—CAPITAL PUNISHMENT—SHIPPING—ENROLMENT OF VESSELS.

1. On an indictment for murder twenty peremptory challenges of jurors are allowed.

2. Conscientious scruples against finding a verdict which would lead to capital punishment are a good cause for challenge of a juror in a capital case.

3. An enrollment will be presumed to have been legally taken out unless the contrary is proven.

4. On an indictment for murder, by throwing a child overboard, the burden is on the government to prove (where such a defense is set up) that the child had not died in a fit before it was thrown overboard.

The indictment contained two counts, the first charging the prisoner [Catherine Hewson] with the murder of her child (a female infant) on board the steamer Massachusetts, on the passage between New York and Boston, on the night of July 30, by throwing it overboard; the second charging the prisoner with the murder of a child (not alleging it to have been her own).

Franklin Dexter, U. S. Dist. Atty.

Charles B. Goodrich and John P. Putnam, for the defense.

At the commencement of the trial the counsel for the prisoner claimed the right of peremptorily challenging thirty-five jurors, but the court ruled that the right was limited to twenty. The district attorney suggested that each juror before being sworn in chief should be asked whether he had any conscientious scruples as to finding a verdict of guilty in a capital case.

STORY, Circuit Justice, said this had been the practice in this court for the last twenty-five years, ever since the escape of two of the most atrocious men he ever knew in Rhode Island, through the scruples of two jurymen.

Accordingly. as each juror was called, the question proposed was asked by the district attorney. Three jurors declined being sworn from conscientious scruples, and were set aside by the court. The prisoner challenged nineteen jurors peremptorily.

Before opening for the defense the counsel for the prisoner stated the point which they should take respecting the jurisdiction of the court. It was argued that the national character of the vessel must be made out. A competent enrollment was necessary to make out the national character of the vessel. The acting secretary was not competent to take out the enrollment, as he had since continued to be secretary only for the purpose of taking out custom-house papers. The counsel referred to Hosea v. Buchanan, 16 Pet. [41 U. S.] 215. The point taken by the counsel respecting the ownership of the vessel was this. It does not appear, affirmatively, from the evidence that the individual corporators are American citizens. The corporation is one acting under an act of the state of New Jersey.

THE COURT on these points ruled against the defendant, and said that it would be presumed that the enrollment was legally taken out until the contrary was shown.

2 [Captain Joseph Comstock. The steamer Massachusetts, in July last. was in the employ of the New Jersey Steam Navigation Company. She was plying from New York to Stonington, across the Sound. I do not remember having ever seen the prisoner at the bar, before the present time. On the evening of July 30, I was called about 12 o'clock at night, by the second mate, and told by him that there was a child missing, and that it had probably been thrown overboard. We were then nearly opposite the mouth of the Connecticut river, and off Saybrook. This was about two hours before we arrived at Stonington. I do not recollect the weather. I was then above, in the wheel-house. I went below to inquire into the facts, and was shown a woman. who, they said, had had a child. which could not be found. I do not remember the number of deck passengers. There were a considerable number; I should think not less than twenty-five. The deck passengers remain, during night, in the forward part of the main deck. They are not allowed to go aft, or on the upper deck, or in the cabins. They are obliged to remain in a space ninety feet by twenty-eight or thirty. under cover. Large doors lead to the forward part of the deck. which part is not under cover. The latter is fifty-eight feet by thirty-three; thirty-four or thirty-five. The bulkhead goes to the bows of the boat. This is taken up with freight, cattle, horses, &c., if there are any. chains. anchors. and various lines. ropes and other articles. The bulwarks

1 [Reported by Albert Brunner, Esq.. and here reprinted by permission.]

[From 7 Law Rep. 361.]

of the open part are four feet high. I was shown a woman sitting down, covered with a cloak. I asked her if she had had, or then had, a child. After various inquiries, to which for some moments she made no reply, she said that she had had a child, but had eat it up. I set her in a private room, near by, with a man to watch her. Some moments before we arrived at Stonington, the woman sent for me, and said she had made away with her child by throwing it into the sea. At the same time she stated that it was a poor weakly child, subject to fits, and she was a poor destitute woman, unable to take care of it. That was all that was said, except that I put her in charge of a man and woman, who seemed to have some charge of her, the woman having previously tended her child, and who said they would have her arrested on arrival at Boston or Lowell. I do not know that that woman was or was not the prisoner at the bar. I cannot identify her as any person that I have seen before. A thorough search was made for the child at the time. (By STORY, Circuit Justice.) The Sound is about nine miles wide in that place. We were five miles from one shore and four from the other, when I first received the information. The information was given very shortly after the child was missing.

[Cross-Examined. At that time I had some conversation with the passengers. I might have said that the woman was insane, out of her head, or in liquor, and probably did. I cannot say, positively, what I did say. My impression at the time was that she was out of her head. I stated other reasons that might have influenced her. I supposed she was in liquor until I examined her; but after examining her, I did not think so. She was confined nearly two hours. I confined her because many people were crowding around her, and there was great excitement manifested about the case, among those on board. My object was to protect her from harm or annoyance. It was not a bad night. I think it did not rain. I do not know who instituted this prosecution. I did not advise those people to do it, who appeared to have the care of her. I probably should, if those people had not taken her under their charge. Darwin F. Rockwell is the permanent secretary of the corporation in New Jersey, and was at that time. They have a secretary in New York. Rockwell lives in Jersey City. I think his only business relates to custom-house papers. I think he has no books or papers, except those relating to custom-house business.

[Direct Resumed. The nature of the act, as being done by a mother to her child, led me to suppose that she was in liquor or insane. I saw nothing else except her saying she had eat the child, to induce me to suppose so. I made the observation while I was talking with her. I noticed nothing else showing alienation of mind or insanity. I do not personally know the extent of Rockwell's duty.

[Captain William Comstock was then sworn, and testified as follows: I reside in New Jersey. I am agent in Providence of the New Jersey Steam Navigation Company. This boat is owned by and was built for that company.

[Cross-Examined. I am general agent at Stonington for this end of the line.

[James Simpson. I was a passenger together with Catherine Hewson, the prisoner at the bar, on the night referred to. I passed the night on the forward deck, under cover. I was a deck passenger. It was dark that night, and I could not identify her face. I saw her next morning, and the prisoner is the person. We were sitting two or three yards apart. My wife was with me. My wife sailed for England October 8. I saw a woman sitting on a trunk; she had a child; the child appeared cross. I saw her take some clothing from the child and put it into the trunk, and take some from the trunk and put it on the child. I think it was under clothing. I saw the child myself. I heard it cry. It appeared about a month or six weeks old, from the size of it. After that, she walked up and down the deck, trying to pacify the child. She had it on her lap. I could not say whether she was nursing the child or not. I had no conversation with her before or afterwards. She walked up and down for a few minutes. This was in the dead of the night. She then either went out of my presence, or I went out of her's, I don't know which. I think I went aft, towards the engine. I was walking about. I did not at that time go forward. I next saw her, about a quarter of an hour after. She still had the child. She was in about the same place as before. I think the child was peaceable then. I think we were both walking up and down for some time. She was afterwards out of my presence for some time. I heard a rumor that she had thrown her child overboard. I saw her, but did not hear her say anything to me. To others she said it was none of their business. She had not then her child with her. I did not hear any one ask her questions, nor hear her say anything to anybody. I saw the captain asking her questions, but did not hear what they said. I saw the woman in the morning, sitting on the opposite side of the steamboat to me. When the rumor went that the child was thrown overboard, I went up to her, and saw the woman. It was the same woman that I saw the next morning, after daylight. I recollect now that I was in another steamboat when I saw her next morning. I was crossing in the ferryboat in the morning. That woman that I saw in the morning is the prisoner. I do not recollect that I saw any horses on board the steamboat that night. I did not hear the woman herself say "It is none of your business."

[Cross-Examined. I rather supposed, at the time that she had the child in her lap, that she was nursing it. In the ferryboat in the

morning she was sitting by herself. I should think, from the child's crying, that it was well. It cried strong. I could see the child's face. It looked healthy enough from where I was sitting. I think the clothing taken from the trunk was a diaper.

[James Gay. I live in Boston. I belong to Harnden's Express. I was on board the steamboat Massachusetts on the night of the 30th of July last. I did not see the woman at night, I saw her the next morning. The prisoner is the same woman. I saw her on board the steamboat Massachusetts, and in the ferryboat. She was in a different car on the railroad track. I had no conversation with her. The baggage was on the forward part of the main deck. I believe there were horses on board. I would not swear positively that there were. We arrived about 2 o'clock at Stonington.

[Cross-Examined. We carry horses so frequently, that I cannot recollect positively respecting that time. I think I saw horses there, but am not positive enough to swear to it.

[Patrick Carigan. I am a Catholic. (STORY, Circuit Justice, remarked, that some four or five years ago, a witness was brought on to testify, who was a Catholic, and a Bible was sent for, which should be certified by the bishop to be a correct version, according to the doctrine of the Catholic Church. The bishop said, that an oath on a Protestant Bible was equally binding, or indeed an oath taken in any other way. He gave, however, his certificate in writing, that the copy produced was the version used in the Catholic Church, and the witness was sworn thereon. In the present case, the witness was sworn in the usual way, neither counsel making any objection.) I consider an oath administered in the usual form, equally binding with an oath upon the Bible. I was on board the steamboat Massachusetts on the same passage with the prisoner. I saw her along side of the same steamboat in New York. This was about five o'clock, the day I went on board. I don't know whether she had a child or not. She appeared to have something in her arms. I had no conversation with her then. I saw her next, some time in the night. I don't know whether she had a child with her or not. I saw her have a child in her arms, and heard the child. She had on a big cloak. The child was crying. I spoke to her before I heard the child. She asked me how far it was before we got into the cars. I told her I didn't know exactly. I asked her next why she was sitting out there alone. She was sitting outside, on the part of the deck which was not under cover, by herself. I asked her why she didn't come in. The weather was fair—cold, but not very cold. She said she wasn't cold. I neither saw nor heard the child at that time. She asked me if I was going to Boston; I told her yes; that I had lived in this country four or five years. She asked what

kind of a place it was about serving girls. I told her the price was from a dollar up. I asked her if she had any friends there. She said her husband was in Boston for four or five years. I asked her in what street did he live. She named some place that I didn't know anything about. I asked what did he do. She said he worked along shore. Then I asked her how long since she left Ireland. She said she was in Ireland ten weeks ago. At this time I heard the child cry. Says I, "What! have you got a baby?" "It's none of your damn business," says she. I then moved away from her. She got mad. I saw two or three women coming towards her, and they came and asked her to go inside. A little while after, she did come in. She sat down on a trunk, pulled her cloak around her, and gave the child the breast. I saw her nurse the child. The child was crying all the time, and a woman alongside of her said she would take the child; she did so, and gave it her breast. The prisoner then took off her hat and cloak, and fixed up her hair. This woman that gave her the breast said she took hold as good as her own child, that was five or six months old. The prisoner said, before the woman took the child, that it had fits. The people gathered round. Some said it looked sick. The woman gave her back the child, after nursing it. It began to cry again soon after. One woman said she had one which was sick, just like this one, and that it took the breast a little while before it died. The prisoner walked about with the child, and walked up among the baggage. After a while, I don't know how long, she walked out forward. She stopped out there about twenty or thirty minutes. I was then outside of the sheltered part of the deck. A parcel of us gathered up to see what she was out there for, where there were horses and such things. She had the child after she went out. We remained inside of the baggage cars, between the cars and the uncovered place, and remained there till she came back. She went out forward as far as she could go out. There were horses there. When she came from forward, a woman asked her to let her see her child. She said it was sleeping, and she did not know why every one made themselves so uneasy and sick about her child. She had her arms in the same way as when she carried the child out. She came in, and we insisted that we should see the child. She said she had given it to a woman, a friend of hers, down in the cabin. There was no woman down there. I did not see, but others went down to see. She had not the child there. They opened her cloak, and pulled her hands apart, and everything. A number of women came and inquired about the child. She was mad, and would hardly give any answer, and what she did was not very civil. Then the captain came round and asked her. She made no answer, until he had asked a good many times. The

captain asked her, did she stow it away anywhere. She made no answer. He then searched, and found nothing. He came back and shook her by the shoulder, and asked her what she had done with the child. Says she, "I eat it." He then walked away from her, and said he would have her secured. She then got up, and said the child died in a fit, and that she hove it overboard. Some one told the captain that she would throw herself overboard. She kept moving about, back and forth, as if she meant to go overboard. One of the men kept by the side of her to take care of her. This was in the night time. Some one said it was between nine and ten. One of the captain's men said it was between ten and eleven. She was then put into the cars. There was no moonshine, but there was a lantern near where she sat. I heard her tell some folks that the child was three weeks old, and tell others that it was only eleven days old.

[Cross-Examined. I was born in Ireland, in the county of Linegal. I first came to this country six years ago, nearly seven years ago. I arrived at St. John's. I have lived thirteen months at the corner of Battery and Commercial streets, Boston. I lived in Philadelphia three years. I worked in a junk store in Boston, for Mr. Phillips. I have a family. When I took passage on board the steamboat Massachusetts, I intended to go to Ireland. I did not intend to take my family, nor to stop long. I could not get a chance to go. I saw this woman walking about on the dock some time in New York. I saw no child with her. She kept her arms out with the cloak over them. I do not know how long it was after I went on board that I first saw her again. A little more than two hours I should think. I went on board a little after five. I first saw her sitting alone. I saw her a good while. I saw her all the time afterwards, till she went forward. Nothing was said about going to see what she was doing out there. We heard the child cry, when she went out, and did not hear it when she came back. Before she came back, some said she was out there for no good purpose. I do not remember whether I have now testified to more than I did before the commissioner. She offered the child her breast, but the child did not take her breast. She held the child to her breast but a few minutes. This was soon after she came in. She went out soon after the other woman gave the child the breast. I do not think she treated the child so well as I have seen my wife treat a child. I did not testify before the commissioner that she treated the child kindly. I did not use any language improper or insulting to her. I do not know who told the captain about her. I asked no person to look at the woman. I did not point out the woman to any one. In the cars, I told her she would be put in the state prison. She appeared not like other women in her manner and the use of her tongue.

Since I have been in Boston, I have been doing nothing a part of the time, and a part of the time at work in a junk store. I have been in jail. I cannot tell what for. I was in the cell No. 21. I had no conversation with the prisoner there, except when she spoke over from her cell. She spoke first. She kept dancing and hollering. I told her, only once, that she would be dancing and hollering over South, before long. I told her I would do all I could against her. I did not say I would swear hell against her. I said I would do all I knowed against her, but not all I could. Her first answer when she came in from the forward part of the boat was, that the child was asleep, and that she did not know why they should be so uneasy about her child. I so stated before the commissioner. I think so, but am not certain. She told the captain that the child had fits, and died of fits. He was near enough to hear her. She got up and told him so. The man who had charge of her walked with her back and forth. I can't say how long, or how many hours. It was not one hour.

[Direct Resumed. The woman and the darkies who were in jail kept hollering to me, which made me say what I did to her at that time.

[Captain Comstock, Recalled. I directed the woman to be put into a little room, or a kind of gangway between two rooms, not more than four feet square, where there was a chair for her to sit down. This was immediately after I examined her, as I before stated. I did not know that she walked about, afterwards, at all. I directed a man to stand at the door, and keep watch of her, and let no one speak with her. I supposed my directions were complied with. I will not swear that she did not walk about.

[Derastus Clapp. I am a constable in the city of Boston. On the 30th of July last I was at the Providence depot on other business. In consequence of what was said to me there, I took the prisoner into custody. The prisoner stood near the baggage car, with others. She had a ticket for her baggage. I requested the baggage-master to take charge of her baggage, which she had pointed out to me as hers. She inquired if it would be safe. I told her it would. I then requested her to walk with me. She came with me, without replying. While going to Charles street, I said to her, "How came you to be so foolish as to throw your child overboard?" Her answer was, "It was dead, sir." I asked her how it came dead. She said it had fits. In another conversation afterwards, she said the child had spasms. I told her that it was improper to throw her child overboard if it was dead, without letting any one know it. She said that she had known others to do it: and I understood her to say, that she had known others to do it on her passage to this country, when their children were dead. I cannot give the pre-

cise words of this answer. I asked her how long she had been in this country. She said about a fortnight; and that she came in a vessel to New York; that she belonged in Ireland, in the county of Cork. She said that her husband had been from Ireland about nine months; and that he had sent for her to come to this country. I asked her where she was going. She said she was going to Mobile to find her husband. I informed her that she had come two hundred miles out of her way. I inquired of her whether the child was male or female. She said it was a female, and that it was born on the passage, about three weeks previous. She stated that she had no acquaintances or friends that she knew of in this part of the country. That is all that I recollect. My reason for asking her these questions was, that I arrested her without a warrant. She said that her husband's name was John, with the same name which she gave as her own, and that he was a laborer. I have not seen her since, till I saw her on the examination before the commissioner.

[Cross-Examined. I think three or four persons spoke to me at once to make the arrest. Several persons pointed her out to me. I think, as we went across the Common, that she said she felt weak and faint. I think she sat down on one of the benches. When she said the child had spasms, she said it had them a great deal of the time, or frequently. She made no complaint about my taking her into custody. I thought she appeared stupid or indifferent.

[Before opening for the defence, the counsel for the prisoner stated the point which they should take respecting the jurisdiction of the court. It was argued that the national character of the vessel must be made out. A competent enrolment was necessary, to make out the national character of the vessel. The acting secretary was not competent to take out the enrolment, as he had since continued, to be secretary only for the purpose of taking out custom-house papers. The counsel referred to Hozey v. Buchanan, 16 Pet. 215. The point taken by the counsel respecting the ownership of the vessel was this. It does not appear, affirmatively, from the evidence, that the individual corporators are American citizens. The corporation is one acting under an act of the state of New Jersey.

[On these points THE COURT ruled against the defendant, and said that it would be presumed that the enrolment was legally taken out until the contrary was shown.

[J. P. Putnam opened for the defence, and after dwelling upon the danger of trusting to circumstantial evidence, the necessity of caution in receiving confessions as evidence against the prisoner, and the principle that the confessions, if introduced by the counsel for the prosecution, must be all taken to be true, unless contradicted by other evidence, and incompatible therewith, stated that the ground of defence would be, that the child had been previously unwell, that it died of sickness, and was by the mother committed to the waters of the Sound, and that the mother was laboring at the time under a partial aberration of mind.

[Dr. Horatio Stone. I reside in New York City. I am a physician. I saw the prisoner on the 20th of July last. I was called to see her professionally in the afternoon of that day. I went to the house, in Washington street, New York, at the house of Mr. Nixon. I found she had been delivered of a child, and, as I was told, about an hour before I arrived. I found her laboring under strong symptoms of fever, and nervous agitation; her pulse small and quick, throbbing of the temporal arteries, tongue thick and coated, tenderness, on pressure, of the abdomen, and distention of the abdomen. The symptoms were those which precede puerperal fever. The placenta had partly passed away, and a portion remained in the vagina. There was a diseased state of the uterus, and the placenta was also in a diseased state, the consequence of which would be imperfect nutrition to the child. The room was a small one, with but one small window, in which were two beds, and a quantity of clothes and baggage. She was lying on a poor apology for a bed, composed partly of her own trunk and clothing. I could obtain but little information from her. I could with difficulty obtain any reply to my questions. She was suffering much from pain. There was apparent congestion about the brain. The child appeared weak and shrivelled, much less vigorous than children usually are. I think I visited her only twice. I visited her the second time about sixteen hours after the first visit. The symptoms of the mother were nearly the same, but rather aggravated. It was stated that the dispensary physician had been spoken to, and would attend to her, and that she would be unable to pay any fee for medical attendance. The accommodations were very bad, the air very close and warm, and the room filled with the unpleasant odor of foul clothing. The people there appeared to be attending her as well as they could. Puerperal mania is a frequent attendant of puerperal fever. It usually deranges or destroys the moral sense or natural feelings. It sometimes comes on three or four days, and sometimes a fortnight after the birth of the child. It sometimes comes on suddenly. It is not uniform in its appearance or duration. It may disappear within twenty-four hours after its coming on. Some of the symptoms are like those of other kinds of mania, such as reasoning from wrong premises. Other symptoms are perversions of the moral sense and the natural feelings. A mother who had a tender heart, and an affection for her child, would, immediately after the appearance of the mania, deny the child to be hers, wish it to be dead, or perhaps try to kill it; but

on the disappearance of the symptoms, she would caress it with fondness. Such cases have come under my own practice, and are also laid down by distinguished physicians. There was some discharge from the eyes of the child. They were evidently diseased.

[Cross-Examined. Puerperal mania differs from other species of mania in being temporary and more uncertain. I think it produces a temporary congestion of the brain, but not organic disturbance. The mania tends more to disturb the moral sentiments than the intellect. It would be likely to recur after an interval of ten days. I observed no specific disease in the child, which would show a complaint inherited from the mother.

[Dr. Thomas M. Cocke. I reside in New York. I am a physician there. I am connected with the lying-in hospital. I was called last summer to see a woman at Mr. Nixon's, Washington street, New York. I went at the request of some one. I went up stairs and saw a woman lying on her back with her eyes closed. I could get no reply from her. Her eyes were closed, pulse accelerated, tongue coated. The symptoms threatened puerperal fever. The room was small, confined, littered with bedding and other articles. The child was wrapped up, and had pueral ophthalmy, a species of sore eyes peculiar to infants. I do not recollect to have seen that woman afterwards. I directed that she should be removed to the almshouse, and gave a certificate for that purpose. Such certificates may be given by any physician, and they are submitted to the commissioner of the almshouse. Puerperal mania is a very common attendant of puerperal fever. There are two forms of puerperal mania; one is temporary, and soon passes off; the other, usually, is developed two or three days after, and sometimes later. Diseased placenta would occasion a child to show the effect of imperfect nutrition. The skin would be shrivelled. Improper nutrition to infants tends to occasion convulsions.

[Cross-Examined. Puerperal mania may assume any form which other mania does; I do not think that it has any symptoms peculiar to itself. Nursing by a woman who has a child some months older, usually occasions convulsions. This is an established principle. I would not allow a woman with older milk to nurse a young child in any case where I had anything depending upon it. A child dying in convulsions does not usually make any noise.

[Abraham Nixon. I live in 152 Washington street, New York. I recognize the prisoner as a woman who was at my house last July. I called Dr. Stone to see her. I found her at a store in Washington street, near the Troy steamboat landing. A stranger called at my house, and directed me to her as a person who wanted to get boarded. I took her to my house. She remained from a week to ten days. The child was born at my house. Myself and wife, another person and

his wife, and this woman occupied one room. A second doctor called afterwards. She went from my house on board the steamboat Massachusetts. The stranger who called at my house wished me to go to the store to find the woman.

[Cross-Examined. The man who came to me told me the woman came in the Troy boat. He did not tell her name. I did not know him. He said he knew me.

[Dr. O. W. Holmes. I am a physician of this city. Children a short time after birth are frequently subject to convulsions. The nine days disease received that name at the time of a general epidemic in Dublin hospital, which carried off a great number of infants. Want of air, want of care, want of cleanliness, are among the causes. Young children are more subject to the disease than older children. Experienced persons cannot tell, from the appearance of a child, as to its robustness at birth, whether it would be subject to convulsions. Inward fits is a term frequently used by uneducated or less discriminating persons. It is frequent among the Irish. The term is by them applied to different kinds of convulsions. There is a form of fits which appears to be characterized by spasms of the heart. It is sometimes followed by complete recovery, sometimes by death. Some internal malformations occasionally prove fatal to children, at the end of several days after birth. Among these are obstructions in different parts of the alimentary canal. These would not be likely to cause sudden death. Other internal malformations might, and might not be attended with convulsions. There are cases where children lie torpid, in a state resembling death. The symptoms of puerperal mania vary very much, from violence to simple wandering. This form of mania may take all the symptoms of other mania. It lasts sometimes, but rarely through life—sometimes for weeks and months. Still more rare are cases lasting for about twenty-four hours. The causes of this mania cannot be assigned with any certainty, with the exception of pregnancy. Nursing by a woman with an older child would not usually be considered dangerous. There exists a strong prejudice against it, however.

[Dr. Walter Channing. Puerperal fever arises from a great variety of causes, such as inflammation of the bowels, inflammation of the uterus, and other kinds of excitement. Dr. Channing described the symptoms and course of this fever at some length. The woman is apt to lose her interest in her child, and is absorbed in the contemplation of her own sufferings. There is then an entire absence of maternal feeling.

[Cross-Examined. I cannot say that the existence of diseased placenta in the mother, would naturally occasion convulsions in the child.

[At this stage of the cause, Mr. Dexter, upon a suggestion of STORY, Circuit Justice,

proposed to the prisoner's counsel, that the cause should be submitted to the jury without argument, upon the charge of the judge, it appearing, from the nature of the evidence adduced in behalf of the defendant, that a conviction could not probably be had.    To this proposition the prisoner's counsel assented.    All the witnesses on the part of the prisoner were not examined.] [2]

STORY, Circuit Justice, in his charge to the jury, adverted to the evident facts that the woman was not in her right mind, and that her answer that she had eat her child showed that her reason was not in operation for any useful purpose.    He also commented upon the absence of any motive for the crime, the previous sickness, weakness, fever. and excitement of the prisoner, the probability that her mind was diseased. her situation among the deck passengers on board a steamboat in the night, poor, destitute, and friendless, the doubt whether the child was not dead before it was thrown overboard, and the burden upon the government to make out the case beyond a reasonable doubt; and intimated very decidedly that there was no ground for convicting the prisoner.

The jury, without leaving their seats, rendered a verdict of not guilty.